### RICHARD A. EMERSON *v*. STATE OF INDIANA.

[No. 271S43. Filed January 8, 1974.]

*Mrs. Harriette Bailey Conn,* Public Defender, *Malcolm K. McClintick,* Deputy Public Defender, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Assistant Attorney General, for appellee.

PRENTICE, J.—This is a belated appeal filed by permission of this Court under Post-Conviction Rule 2, § 2.

Defendant (Appellant) was convicted April 3, 1970 of murder in the first degree. The homicide occurred on May 11, 1968. His appeal presents the two following questions properly raised and preserved in the trial court.

I. Was it reversible error for the trial court to overrule the defendant's objection to action of the prosecuting attorney in pointing out the defendant to the State's witness in

connection with the witness' identification of him as the man who shot and killed her husband?

II. Was it reversible error for the trial court to overrule the defendant's motion for mistrial predicated upon the prosecuting attorney's having made reference to the defendant's prior conviction for assault and battery with intent to rob?

Joseph Horvath resided with his wife, Marcia, and their two young children at 731 North Ketcham Street in the City of Indianapolis. The Horvaths returned to their home from a family outing late in the evening on May 11, 1968. Joseph was driving the family automobile, and he parked at the curb in front of their home. Marcia was in the front passenger seat with one child asleep on her lap. The other child was asleep in the back seat. The window by the front passenger seat was open. As Joseph came to a stop, the defendant appeared, thrust a pistol through the open window and demanded that the door be unlocked. The door was opened, and the defendant entered, pushed Marcia against Joseph and sat next to the open window. Still brandishing the pistol, the defendant directed Joseph to drive and said that he was going to kill them. Joseph said to the defendant that he saw that he was in trouble and offered to help him, saying that he could have such money as he had and the automobile. The defendant again directed Joseph to drive, and Joseph commenced. As he did so, he continued to offer his money and the automobile. During this period, Marcia was staring into the defendant's face. He ordered her not to look at him, but she continued to stare, being unable to look away.

The children awoke and began to make inquiries concerning the defendant's character and purpose. Joseph, having driven only a very short distance, stopped the automobile and turned off the ignition in front of No. 735 North Ketcham, two houses north of their residence, saying to the defendant that he would help him if he could and that he could have the automobile and money, while simultaneously reaching for his billfold. With this, the defendant became enraged and lunged across

Marcia to get to Joseph, saying that he was going to kill him if he did not do as ordered. A fight between the defendant and Joseph ensued in the front seat and the pistol was discharged in Marcia's face. That shot went through the body of the automobile but did not strike anybody. The front door on the passenger side flew open, and the defendant and Joseph fell to the ground, still fighting. While Marcia was trying to collect her wits and attend to the screaming children, the fight continued, and she heard a second shot. Joseph screamed and said, "Marcy, I have been shot." For a moment Marcia heard nothing more, then she heard running steps. The defendant came to the driver's side of the parked automobile and Marcia saw his face again. He departed, looking back as he crossed the street and disappeared.

Three young boys who resided in the Horvath neighborhood witnessed the fight and shooting but from such distance and under such lighting conditions that they could not identify the assailant. One of the boys, Roger Thompson, attended a police lineup and selected the defendant from seven men of similar size and appearance, as one who, from the side, looked like the man he saw shoot Joseph Horvath. He did not incriminate the defendant further.

In March or April of 1969, the defendant was in police custody on a preliminary charge. Hoping to curry favor with the authorities, he volunteered to give Officer Offutt some information concerning other crimes in return for some special consideration. Officer Offutt asked him if he knew anything of the Horvath case. He said that he did and proceeded to implicate Henry Turner, Sam Love and James Edwards. He said that he was with them in the automobile and that Turner left the car, returned shortly after a shot was heard and said that he thought he was robbing a woman but that there was a man in the car and he thought that he had shot him. He then volunteered some information concerning other crimes in the same area but declined to discuss the Horvath killing any further, without some guarantee of special consideration.

Acting upon the information received from the defendant the police carried their investigation to Edwards and Love. Ultimately they were arrested and interrogated in the presence of the defendant. Their stories were substantially the same as their testimony hereinafter related. During Edwards' interrogation, Officer Offutt observed the defendant kicking him under the table. The defendant said that Edwards and Love were lying but declined to relate his version of the occurrence.

At the trial, Edwards and Love testified that they and the defendant were at a tavern on the evening of the crime. Between 10:00 p.m. and midnight, the defendant requested them to drive him to another part of the city. They agreed and left the tavern in Edwards' automobile, with Love driving and the defendant riding in the back seat. There was a pistol in the automobile. As they drove past the residence of the decedent and approached near the next intersecting street, the defendant suddenly and without stating any reason asked to be let out. Love drove around the corner and parked. Defendant got out of the vehicle, and as he did so, he took the pistol from underneath the center arm rest of the front seat. Edwards and Love waited in the automobile for several minutes. They heard a sound like an automobile backfire or a gun shot. A minute or so later, the defendant came back to the car running and out of breath and said that he thought he had shot somebody.

James Turner testified as a witness for the defense and stated that shortly after midnight of the night of the crime, he had been walking in the area on his way to visit a girl friend named Joyce. He could not remember her last name nor her street number. As he walked, he saw James Edwards from a distance of about one-half city block, running south on Ketcham Street near the Horvath residence. He called to Edwards, who did not answer but kept running. He also saw Edwards' automobile with Love seated in the driver's seat. He ran after Edwards and called to him requesting a

ride, but Edwards jumped into the automobile and he and Love drove off without turning on the lights. Turner walked to the tavern where he saw Edwards and Love, who were together. He also saw the defendant who was alone, and he related to the defendant what he had seen earlier.

Marcia Horvath attended two police lineups approximately one month following the crime. Defendant was not in either of these lineups, and she did not identify anyone in either as her husband's assailant. Also, she viewed groups of police file photographs, which did not include any of the defendant. She made no identification therefrom. After the arrest of the defendant, she viewed the defendant along with six other young men of similar appearance in the police lineup. Upon this occasion, she identified the defendant as the man who had killed her husband.

I. Marcia Harvoth, in her testimony gave the following description of her husband's assassin. "He was tall, well built, nicely dressed, short hair more like a crew cut and long slim fingers and he was light complexioned. * * * Negro, * * * a light brown and clear skin." She proceeded to relate that he had a high forehead that receded and moved back and forth when he talked, wide eyes and was six feet tall—or less. She was asked if she then saw him, and she indicated that she did not. The procsecutor then directed her attention to the counsel tables and asked if she recognized anyone as the man who killed her husband. She was permitted to answer the question over the defendant's objection and said that she did not. The prosecutor then moved to require the defendant to stand, and as he stood, she nodded her head. When asked what she meant, she said: "He answers to the description, he answers to everything I said. Yes, that is the man." On cross-examination she stated that the prosecutor's having expressly drawn her attention to the defendant did not influence her identification of him as the guilty party.

Thereafter, the prosecutor had James Edwards displayed to Marcia, and she testified that he was not the man who shot

her husband and that he did not resemble the guilty person in size.

It could be questioned whether or not the defendant has preserved this question, inasmuch as he made no specific objection at the time he was required to stand. However, he did object when the State first directed the witness' attention to counsel tables, and although he did not state his grounds for the objection, the comments of the trial judge, as he overruled the motion, indicated that he understood its basis. We, therefore, consider that the defendant was objecting to the in-court identification procedure as being unduly suggestive. Requiring him to stand focussed the witness' attention upon him even more directly than did the action of the prosecutor in directing the witness' attention to the counsel tables, but the court had, in effect, ruled that the procedure was not improper.

Defendant's position upon this question is founded upon our opinion in *Emerson* v. *State* (1970), 253 Ind. 515, 255 N. E. 2d 532, but we think he places a strained interpretation upon it. We there held that it was not error for the court to permit the witness to identify the defendant, notwithstanding that he had testified that he did not know him, inasmuch as he had also testified that he saw him in court. A distinction was drawn between "knowing" a person and "recognizing" him. Defendant would have us regard that decision as authority for refusing to permit a witness to identify the defendant if the witness had previously stated that he did not see or recognize him. What we held in *Emerson, supra,* was that, under the circumstances of that case, it was not reversible error for the prosecutor to direct the attention of the witness to the defendant for identification purposes. We think it unnecessary to re-treat the issue in detail. The question has been well treated and supported in *Emerson, supra,* but the following statements therefrom do bear repeating.

"It is the better practice to ask the witness to point out the person referred to in his testimony rather than point

out the person for the witness if there is an issue of identity. But this does not mean that such conduct is per se prejudicial as a matter of law. In this respect the evidence as a whole must be considered. (Citations of authority).

\* \* \* \* \*

While we do not condone suggestive questions with reference to the identification of the perpetrator of the crime, we at the same time can find no prejudice resulting from the question asked under the circumstances here presented." 255 N. E. 2d at 534, 535.

Whether or not identification procedures have been so suggestive as to constitute reversible error, to a large extent, then, must be determined within the context of the particular case. The witness' failure to pick the defendant out from the other persons in the court, even when the group was narrowed to the few seated at counsel tables, might very well have been influential with the jury in determining what credence to assign to her testimony. She had previously given a detailed description of the defendant's appearance, however, and had had ample opportunity to have his appearance imprinted upon her memory. Although she was slow to recognize him in the courtroom, for whatever reason, we do not see in this record anything that indicates that her identification of him was tainted by the State's action.

II. Upon direct examination, the defendant testified that he had had certain prior convictions, including a plea of guilty to a charge of assault and battery with intent to commit a felony. His police record in the hands of the prosecutor reflected that the felony attempted was robbery. For reasons not made clear to us by either counsel, both appear to have regarded the disclosure of the specific felony attempted as having particular significance. The prosecutor on cross-examination, offered a copy of the defendant's police record into evidence, and the court sustained the defendant's objection. Next, the prosecutor asked the defendant if that police record did not disclose that the attempted felony was robbery. The defendant objected and moved for a mis-

trial. The court sustained the objection, denied the motion for mistrial, admonished the prosecutor and instructed the jury to disregard the question, which had gone unanswered. Again, it is not clear to us why the court sustained the defendant's objection to the prosecutor's cross-examination attempt to get the defendant to state with particularity the felony for which he had been convicted. The record was not admissible, and it was error for the prosecutor to attempt to get the defendant to relate its contents. However, we do not perceive such prejudice to the defendant as to warrant reversal. In *White* v. *State* (1971), 257 Ind. 64, 272 N. E. 2d 312, upon which the defendant relies, the State's witness, a police officer, gave an unresponsive answer to a question on direct examination and in so doing deliberately announced that the defendant was suspected in connection with another crime of the same nature as the one upon which he was being tried. In our opinion, we set forth a number of considerations that we deem material when determining whether or not a motion for mistrial should be granted. We also reiterated that the granting of a mistrial motion rested largely in the sound discretion of the trial judge and that the question is one that must, of necessity, be determined by the facts of each case as it arises. In view of the evidence of the defendant's guilt and the relative insignificance of the disclosure of the felony attempted during the assault and battery to which the defendant had pled guilty, we cannot say that the prosecutor's misconduct placed the defendant in a position of grave peril. On the contrary, we think any innuendo injected by the question could have emitted but an infinitesimal hue within the spectrum viewed by the jury.

The defendant has further assigned as error the overruling by the trial court of his motion to strike the testimony of pre-trial lineup witnesses, asserting that the lineup was impermissibly suggestive. We decline to pass upon this issue, as the question was not timely presented to the trial court. He made no objection to the testimony

at the time it was given, and he cross examined vigorously upon the subject. However, only after the State rested its case did he move to strike such evidence. Such motion came too late. In the absence of circumstances that preclude a timely objection, a party may not wait until the evidence has gone before the jury and then ask that it be stricken. *Johnson* v. *State* (1972), 257 Ind. 682, 278 N. E. 2d 577. *Beeler* v. *State* (1952), 230 Ind. 444, 104 N. E. 2d 744.

We find no reversible error, and the judgment of the trial court is affirmed.

Arterburn, C.J. and Givan and Hunter, JJ., concur; De-Bruler, J., dissents.

NOTE.—Reported in 305 N. E. 2d 435.